Cliff Cantor, WSBA # 17893
Law Offices of Clifford A. Cantor, P.C.
627 208th Ave. SE
Sammamish, WA 98074
(425) 868-7813
*Liaison Counsel for Plaintiffs*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT RICHLAND

| | |
|---|---|
| In re IsoRay, Inc. Securities Litigation | Master File No. 15-cv-5046-LRS |
| This document relates to:<br>All actions | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br>DEMAND FOR JURY TRIAL |

Court-appointed Lead Plaintiffs Bodgan Ostrowski, Joseph Kavanagh, and Patrick McNamara and plaintiffs Timothy Yuen and JM Zulueta (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts and information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through their attorneys which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

IsoRay, Inc. ("IsoRay" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons other than defendants who purchased the common stock of IsoRay between 8:15 a.m. EST on May 20, 2015 and 11:36 a.m. EST on May 21, 2015, inclusive, (the "Class Period") seeking to recover compensable damages caused by defendants' violations of federal securities laws.

2. During the Class Period, defendants issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading..

3. Specifically, defendants issued a press release that materially misrepresented the findings of a medical journal study concerning IsoRay's cancer treatment. The misleading press release artificially inflated the price of IsoRay stock. When investors and the market subsequently learned that the statements in the Company's positive press release completely mischaracterized the study's findings, IsoRay's stock price dropped precipitously, damaging investors who purchased IsoRay stock after the issuance of the Company's press release.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

5. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

6. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and because IsoRay conducts business within this district.

7. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

8. Court appointed Lead Plaintiffs Bodgan Ostrowski, Joseph Kavanagh, Patrick McNamara, and additional plaintiffs Timothy Yuen and JM Zulueta as set forth in their accompanying certifications, incorporated by reference herein, purchased IsoRay securities at artificially inflated prices during the Class Period and have been damaged thereby.

9. Defendant IsoRay is a Minnesota Corporation, with its principal executive offices in Richland, Washington. IsoRay develops, manufactures, and sells isotope-based medical products and devices for the treatment of cancer and other malignant diseases in the United States.

10. In particular, the Company produces Proxcelan Cesium-131 brachytherapy seeds for the treatment of various types of cancer (as described in detail below).



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

11. IsoRay securities are actively traded on the New York Stock Exchange ("NYSE") under the ticker "ISR."

12. Defendant Dwight Babcock ("Babcock") has been the Company's Chief Executive Officer and Chairman at all relevant times.

13. Defendant Babcock holds 800,000 unexercised IsoRay stock options, many of them with an exercise price well ***above*** IsoRay's current stock price:

| Unexercised Options | Option Exercise Price | Option Expiration Date |
|---|---|---|
| 50,000 | $6.30 | 3/31/2016 |
| 50,000 | $3.80 | 6/23/2016 |
| 50,000 | $3.11 | 8/15/2016 |
| 100,000 | $0.75 | 5/13/2018 |
| 200,000 | $0.26 | 6/1/2019 |
| 100,000 | $1.43 | 6/30/2020 |
| 100,000 | $0.99 | 6/7/2021 |
| 50,000 | $0.98 | 6/27/2022 |
| 50,000 | $0.58 | 9/5/2023 |
| 50,000 | $2.17 | 5/20/2024 |

14. Babcock also owns 284,068 shares of the Company, representing almost 2% of the outstanding shares.

15. Babcock is referred to herein as the "Individual Defendant."

16. During the Class Period, the Individual Defendant, as senior executive officer, agent, and director of IsoRay and its subsidiaries and affiliates, was privy to non-public information concerning the Company's business, finances, products,



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of his possession of such information, the Individual Defendant knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17. The Individual Defendant participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of his Board membership an executive and managerial position with IsoRay, the Individual Defendant had access to the adverse undisclosed information about IsoRay's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about IsoRay and its business issued or adopted by the Company materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### I. Pre Class-Period Background

#### A. The Company

18. IsoRay was founded in Richland, Washington in 1998 to develop, manufacture and market isotopes for use in the medical treatment of various ma-



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

lignant diseases, including, most significantly, cancer.[1]

19. Most significantly, the Company developed a patented process for separating and purifying Cesium-131 for use as a low dose radiation "seed" brachytherapy, as described in detail below.

**B. Brachytherapy and Cesium-131**

20. Brachytherapy – (brak-e-THER-uh-pee) – is a procedure that involves placing radioactive material inside the body as a means to treat cancer. The radioactive materials provide cancer radiation therapy. Brachytherapy is sometimes referred to as internal radiation.

21. Brachytherapy allows doctors to deliver higher doses of radiation to more specific areas of the body, compared with the conventional form of radiation therapy (external beam radiation) that projects radiation from a machine outside of the body. Brachytherapy may cause fewer side effects than does external beam radiation, and the overall treatment time is usually shorter with brachytherapy.[2]

22. Treatment of cancer using low dose radiation or "seed" brachytherapy was pioneered in the 1960s. Early brachytherapy research initially theorized about the use of Cesium-131 in a titanium capsule, however scientific and economic

[1] An isotope is any of two or more forms of a chemical element, having the same number of protons in the nucleus, or the same atomic number, but having different numbers of neutrons in the nucleus, or different atomic weights. There are 275 isotopes of the 81 stable elements, in addition to over 800 radioactive isotopes, and every element has known isotopic forms. Isotopes of a single element possess almost identical properties.

[2] The word brachytherapy derives from the Greek prefix "brachy-" meaning "short" or "close."


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

limitations at the time prevented its development and Iodine-125 emerged as an alternative.

23. Beginning in 1967, Iodine-125 became the first radioisotope manufactured in a titanium capsule, or seed. While its use continues to this day, many patients and doctors in recent years have chosen Palladium-103, a faster-acting, shorter half-life isotope than Iodine-125. In order to obtain the clinical benefits of Palladium's short half-life, patients and clinicians were forced to settle for less energy or tissue penetrating power.

24. But a team of scientists subsequently developed a patented process for economically separating and purifying Cesium-131.

25. Cesium-131 is the preferred isotope for use in brachytherapy because it has higher average energy, coupled with a shorter half-life (duration of radiation) than other products.

26. More specifically, Cesium-131 has a higher average energy than other commonly used cancer brachytherapy isotopes on the market. Energy is a key factor in how uniformly the radiation dose can be delivered throughout the affected area.

27. While delivering higher radiation, Cesium-131 also has the shortest half-life of any commonly used cancer brachytherapy isotope at 9.7 days. As a consequence, Cesium-131 delivers far more of a prescribed dose of radiation to the affected area in a shorter period of time than other isotopes. The short half-life of Cesium-131 reduces the time during which the patient experiences the side effects of the radiation.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

28. In 1998, IsoRay was founded to manufacture and market seeds containing this faster, more aggressive isotope.

29. Cesium-131 received FDA clearance in 2003 for treatment of malignant disease of the head and neck, brain, breast, prostate and other organs.

30. The first Cesium-131 patient was implanted at the University of Washington Medical Center in Seattle, WA on October 2004. To date there have been more than 7,000 Cesium-131 implants performed. Cesium-131 is now offered at over 50 clinics across the United States.

31. IsoRay's website explains the use of Cesium-131 in brachytherapy as follows: "IsoRay's various products, including Cesium-131 seeds, sutured seeds, stranded mesh and the GliaSite(R) radiation therapy system, give physicians the ability to directly place a specified dosage of radiation in areas where cancer is most likely to remain after completion of a tumor removal or by placing seeds within the prostate. The ability to precisely place a specified dose of radiation means there is less likelihood for damage to occur to healthy surrounding tissue compared to other alternative treatments. IsoRay's cancer fighting products diminish the ability of the tumor to recur, resulting in important benefits for patients in longevity as well as quality of life."

**C. IsoRay's Cesium-131 Seed Brachytherapy Studies**

32. The Company regularly sponsors studies of its Cesium-131 brachytherapy products. For example, in November 2010, the Company initiated and sponsored a "Study of Cesium-131 Brachytherapy Following Sub-Lobar Resection for Early Stage Non-Small Cell Lung Cancer." According to the documents submitted to ClinincalTrials.gov, a service of the U.S. National Institutes of Health:



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

> For patients diagnosed with early (Stage I) non-small cell lung cancer, a lobe of lung is usually removed at surgery to treat the cancer. For some patients, the removal of a lobe of lung may leave too little lung behind for easy breathing. For some of these patients, it may be possible to perform a smaller-scale surgery ("sub-lobar resection") and place a radioactive implant behind to prevent the cancer from growing back. This study will see how these patients do in terms of controlling their disease treated with a radioactive implant called Cesium-131.

*See* https://clinicaltrials.gov/ct2/show/record/NCT01237171.

33. Similarly, in April 2012, the Company initiated a 100 patient study of Cesium-131 brachytherapy in the treatment of early stage non-small cell lung cancer.

34. In this study, patients who are poor candidates for large surgical resections undergo a limited (sub-lobar) resection followed by Cesium-131 mesh brachytherapy.

35. According to the documents filed with ClinincalTrials.gov, a service of the U.S. National Institutes of Health:

> The objective of this study is the use [of] Cs-131 radiation seeds in lung cancer patients who are planning to undergo a wedge resection for localized disease and follow the patients for cancer control and toxicity. These results will be compared to pre-existing data for I-125 treatment outcomes in lung cancer patients who have had a wedge resection for localized disease.

*See* https://clinicaltrials.gov/ct2/show/study/NCT01757158.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

### D. IsoRay's Stock Price Relies on Positive Cesium-131 Study Results

36. Prior to the commencement of the Class Period, the Company ***repeatedly*** touted the forthcoming publication of studies as the key to increased use of IsoRay's Cesium-131 products. Similarly, analysts viewed the success or failure of Cesium-131 brachytherapy seeds and the studies reporting on their treatment results as the key to IsoRay's success.

37. For example, on April 7, 2014 (more than a year before the beginning of the Class Period) Maxim Group published an analyst report observing that "more collaboration could enhance doctors' adoption of cesium-131 seeds" and that "ISR's major growth drivers are cesiume-131 [sic]."

38. In fact, the Company's May 16, 2014 press release itself was entitled "*Sales Continue To All Study Sites Beyond Planned Enrollment Levels As Data Matures For Presentation And Peer Review.*" Defendant Babcock explained the Company's reliance on peer-reviewed studies and observed their role as the Company's most important marketing tool:

> The recent publication of the first peer reviewed article showing positive results using Cs-131 in the treatment of gynecologic cancer reinforces our strategy to focus on expanding the use of Cs-131 and its unique isotope qualities to treat cancers in the prostate and other body sites, such as brain cancer, head and neck cancer, lung cancer and gyn cancers, while providing patients with a better quality of life than many competing treatments. As the Company continues to accumulate peer reviewed articles reporting the success of Cs-131, we expect to see increasing acceptance of Cs-131 in the medical community that should lead to revenue growth. The marketing of new radioactive medical devices is a process that has numerous steps and is a long


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

> term process requiring patient study data to mature before submission of peer reviewed articles.

39. A July 16, 2014, Maxim Group equity research update reiterated and expanded that view:

> Cs-131 has higher average energy and a relatively shorter half-life than other commonly used brachytherapy isotopes. We believe these fundamental attributes will eventually lead to conversion and adoption by key opinion leaders (KOLs). It will take time. We see IsoRay today – capitalized with close to $23M in cash on the balance sheet – as well positioned to fund post-marketing studies and other support functions to drive adoption. ***Future growth will likely be driven by increasing adoption in non-prostate cancer treatment***. As a result of competition, the branchytherapy [sic] market in prostate cancer has been declining. IsoRay's sales into this market declined at an annual compounded rate of (10%) during F2010-F2013 (ended in June). However, interests in brachytherapy for non-prostate cancers have increased, especially for non-operable tumors. Non-prostate cancer sales grew at a 56% CAGR during the same period.

(Emphasis added).

40. In fact, IsoRay would be relying heavily on clinical trials and published studies to demonstrate efficacy and safety and to aid in attracting early adopters of Cesium-131 brachytherapy. Specifically, the analyst report observed that "ISR is mounting clinical data of safety and efficacy across several solid tumor types (lung, gynecological, head/neck, and brain) following implantation of Cs[Cesium]-131 seeds." *Id*.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

**E. Non-Small Cell Lung Cancer**

41. One of the many areas IsoRay sought to increase use of its Cesium-131 brachytherapy treatment was in connection with non-small cell lung cancer ("NSCLC").

42. NSCLC is a disease in which malignant (cancer) cells form in the tissues of the lung.

43. NSCLC is the most common type of lung cancer. Approximately 85% of lung cancers are non-small cell lung cancers. Squamous cell carcinoma, adenocarcinoma, and large cell carcinoma are all subtypes of NSCLC.

44. There are a number of treatment options for NSCLC: (i) pneumonectomy (removal of the entire lung); (ii) lobar resection (whereby a tumor may be removed by taking out one lung lobe); (iii) sublobar resection (taking out a smaller piece of a lung, known alternatively as sleeve resection, segmentectomy, or wedge resection); (iv) stereotactic body radiotherapy ("SBRT").

**F. Cesium-131 Brachytherapy Treatment For NSCLC**

45. In a July 16, 2014 equity research note, Maxim Group noted that a "study conducted by investigators at Weill Cornell Medical Center showed the results of combining [Cesium-131] brachytherapy to wedge resection to treat early stage NSCLC (non-small cell lung cancer) not suitable to standard lobectomy.[3] The

[3] A lobectomy is a surgical procedure performed to remove one of the lobes of the lungs. The procedure may be performed when an abnormality has been detected in a specific part of the lung. When only the affected lobe of the lung is removed, the remaining healthy tissue is spared to maintain adequate lung function. A lobectomy is most often performed during a surgical procedure called a thoracotomy (surgical incision of the chest). Other lung surgery procedures that


LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

treatment generated better results than wedge section alone and similar to SBRT (stereotactic body radiation therapy)."[4]

46. In a September 30, 2014, Company press release, Defendant Babcock observed that "recently released peer reviewed publications reporting positively on Cesium-131 in the treatment of cancer have continued to provide proof and evidence of our product's effectiveness as reported by industry leaders within the medical field."

47. Defendant Babcock touted previously published studies and noted the importance of forthcoming studies as a means to increase the Company's product use:

> We are committed to positioning IsoRay as the premier brachytherapy company offering cancer solutions throughout the body. We are now actively soliciting new institutions based on our published results, in an effort to have them join existing studies or start their own. In the future we expect to have additional reports reflecting similar successes as the early adopters have achieved. Currently, we are attracting new centers based on published results and new major medical centers are applying for licenses and joining multi institutional studies or ini-

---

may be performed by thoracotomy include a wedge resection, which involves removing the cancerous cells in the lung, as well as removing a margin of surrounding healthy tissue. Wedge resection may be an alternative option to a lobectomy (removing the entire lung). Factors to consider when choosing the appropriate treatment include the severity of the disease and the overall health of the remaining lungs. For example, a wedge resection may be performed if a lobectomy would cause a significant decrease in lung function.

[4] *See* "A Propensity-Matched Analysis of Wedge Resection and Stereotactic Body Radiotherapy for Early Stage Lung Cancer," available at http://dx.doi.org/10.1016/j.athoracsur.2014.04.128



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

> tiating their own. IsoRay's products for both prostate and other cancers continue to receive great reviews with numerous papers being submitted for publication and early stage posters/abstracts being presented at various medical society conventions. Cesium-131, I can confidently say, is the isotope of the future and will prove to be the premier isotope providing safe and effective cancer treatment throughout the body with a strong emphasis on quality of life.

48. A Maxim Group analyst report published the following day recounted an interview with Defendant Babcock, who reiterated that "recent peer reviewed publications reporting positively on Cesuim-131 in the treatment of cancer have continued to provide proof and evidence of our product's effectiveness as reported by industry leaders within the medical field."

49. Similarly, an October 2014 newsletter, published by IsoRay and entitled "IsoRay Happenings," summarized numerous published medical journal studies and emphasized that "the theoretical and empirically demonstrated benefits of Cesium-131 brachytherapy continue to mount."

50. On November 17, 2014, IsoRay announced financial results for its financial quarter ending September 30, 2014. The Company's press release noted that "its strategic focus continues to remain on expanding the use of Cesium-131 to combat cancers in numerous other body sites." The press release also reported that "recent medical journals have reported significant success using Cesium-131" and that IsoRay continued to recruit salespeople in light of "anticipated addition of new studies being launched and the expectation of other study results being released" showing Cesium-131 successes.


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

51. In short, the Company explained that "the key to IsoRay's success" was the "clinical evidence through protocols performed by major medical centers that prove utilizing Cesium-131 is either equal to or better than the current standard of care alternatives."

52. An equity research note published by Maxim Group later that day reviewed the quarterly results, and noted that IsoRay reported "revenues [of] just $1M with a net loss of $0.8 million." The research note pithily summed up IsoRay's marketing strategy: "[p]eer reviewed publications lead to increased market penetration for Cs-131."

53. On January 13, 2015, Maxim Group published another equity research note, observing, again, that "we continue to expect peer-reviewed publications in applications outside of prostate cancer to help drive market share penetration and increase usage in other indications in which it is approved."

54. A February 3, 2015 article published on the well-known financial investing website Seeking Alpha (www.seekingalpha.com) also noted IsoRay's intense marketing efforts: "IsoRay continues to focus its efforts on increasing awareness of Cesium-131." The article noted IsoRay's two main goals: "IsoRay has been around for a while. Its Cesium-131 was cleared by the FDA back in 2003 for the treatment of prostate, breast, liver, brain, head and neck cancers and other malignant disease. Since the clearance, IsoRay has been focusing on two main goals;



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

increasing awareness of Cesium-131 among the medical and patient community, and making it the preferred radioisotope for brachytherapy treatment."[5]

55. On February 18, 2015, IsoRay reported financial results for its quarter ended December 31, 2014. The press release itself was entitled, simply, "IsoRay Reports Confirm Cesium-131 is a True Success in Treating Cancer." The press release focused almost exclusively on peer-reviewed publications and touted the "anticipated addition of new studies being launched and the expectation of other study results being made public through future peer reviewed publications [and the fact that], management expects awareness of Cesium-131 to grow within the medical community."

56. An April 29, 2015 article, also published on the Seeking Alpha website, reported that "long awaited lung study results" concerning IsoRay's Cesium-131 treatment for NSCLC were on the horizon:

> Big news on the horizon for IsoRay (NYSEMKT:ISR). There are a lot of people, as well as Big Pharma that have been watching and waiting for results from Dr. Parashar and Weill Cornell Medical College's "Study of Cesium-131 Brachytherapy Following Sub-Lobar Resection for Early Stage Non-Small Cell Lung Cancer." The clinical trial was completed last May, and investors and big Pharma have been patiently waiting and wondering when the results would be released.
>
> It looks like that day may soon be here. May 8th and 9th, just over a week away, New York Presbyterian Hospital and Weill Cornell Medical Center are presenting "Advances in Brachytherapy: An Interna-

[5] http://seekingalpha.com/article/2880966-isoray-could-see-another-year-of-strong-gains.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

> tional Symposium." This will include two presentations by Dr. Parashar, the principal investigator in the Cesium-131 clinical trial. The presentation that all the IsoRay investors are most interested in will be presented on May 8th at 3 pm. Dr. Parashar will be presenting results of "Brachytherapy on Local Recurrence Rates After Sublobar Resection in Early Stage Non-Small Cell Lung Cancer". This appears to be the results investors have long been waiting for since last May.[6]

57. Indeed, on May 8, 2015, Dr. Bhupesh Parashar presented the "long awaited" results of the study, entitled "Impact of Brachytherapy on Local Recurrence Rates after Sublobar Resection in early Stage Non-Small Cell Lung Cancer" at the New York - Presbyterian Hospital / Weill Cornell Medical Center's international symposium entitled Advances in Brachytherapy.

58. IsoRay issued a press release on May 11, 2015, the first trading day after the conference, concerning the presentation:

> Richland, WA (May 11, 2015) – – IsoRay, Inc. (NYSE MKT: ISR), a medical technology company and innovator in brachytherapy and medical isotope applications, today announced that a number of industry leaders discussed the successes achieved by their patients in a variety of body sites being treated with IsoRay's Cesium-131 internal radiation (brachytherapy) cancer seeds at the "Advances in Brachytherapy" symposium, held at Weill Cornell on Friday and Saturday.
>
> IsoRay Chairman and CEO Dwight Babcock commented, "We are so very pleased to have studies presented reporting successes in peer to peer presentations. Data from ongoing studies continues to be gathered and when it matures the expectation is that it will be peer re-

---

[6] http://seekingalpha.com/article/3116436-isorays-cesiumminus-131-long-awaited-lung-study-results-appear-to-be-coming-may-8th.


LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

viewed and published. We are now hearing from more institutions based on our new recently released peer reviewed publications. Medical professionals rely on these publications to further their practice and learn about new leading edge products."

59. Among other studies, IsoRay's May 11th press release highlighted Dr. Parashar's presentation concerning the role of Cesium-131 brachytherapy in NSCLC:

> **Impact of Brachytherapy on Local Recurrence Rates after Sublobar Resection in Early Stage Non-Small Cell Lung Cancer – Bhupesh Parashar, M.D.**
>
> Dr. Parashar discussed the role of cesium-131 brachytherapy in addition to lung sparing wedge resection surgery for patients with operable lung cancers. ***Although there is some discussion ongoing regarding the use of brachytherapy in these cases***, Dr. Parashar stated that he continues to see the value of cesium-131 brachytherapy for appropriately selected patients.
>
> IsoRay Chairman and CEO Dwight Babcock noted, "Cesium-131 continues to impress medical professionals as reported successes are showing positive results in treating some of the toughest cancer cases. Many of our cases are brought by physicians seeking solutions where first line treatments have failed. Following Cesium-131 treatment, patients are having better outcomes with improved quality of life. Therapy with Cs-131 is successfully treating patients who failed conventional therapies and we believe that it could help many other patients. We are extremely excited to see that Cesium-131 isotope seeds continue to perform so well against aggressive cancers throughout the body. We remain committed to helping patients afflicted with these horrible cancers and enhancing their quality of life."

(Emphasis added).

60. IsoRay's stock price did not react to either the presentation or the Company's press release summarizing the presentation, likely because the Company itself noted that "there is some discussion ongoing regarding the use of brachytherapy in these cases."

61. On May 18, 2015, IsoRay reported financial results for the quarter ended March 31, 2015. Like its previous quarterly press releases, IsoRay touted "Institutional Interest on the Rise Following Recently Published Reports Showing Cesium-131's Success in Treating Cancer."

62. The press release noted that "[r]ecent publications are having a positive impact in the marketplace with new institutions seeking licenses to offer Cesium-131 treatment" and "[s]everal new institutional based studies are in the final stages of implementation and their launch should be announced shortly."

63. Reported financial results themselves were flat, at $1.1 million in revenues, compared with similar results for the quarters ended December 2014 and September 2014.

64. Despite the flat sales, however, IsoRay ***continued*** to tout forthcoming studies as the key to the Company's success. For example, in a Maxim Group equity research note published on May 18, 2015, after the Company's financial results were announced, forthcoming studies were, once again, cited as the key to the Company's success: "We spoke with Chairmen [sic] and CEO Dwight Babcock who sounded encouraged by the clinical data and number of post-marketing studies that should help drive adoption in the future."



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

65. The research note also observed that "[p]hysician adoption is key to Cs-131 and Isoray's success. Isoray, through multiple publications, and abstract presentations at major conferences, is driving awareness to plant the seeds (no pun intended) for Cs-131 adoption." The note's summary concluded, simply that "[m]ore data and more publications are coming to help the push." Between January 1, 2015 and May 19, 2015, IsoRay's stock price did not materially change, despite numerous published studies, the Company's numerous press releases, the May 8, 2015 Brachytherapy conference presentation, or the Company's May 11, 2015 summary of the presentation.





LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

### G. The Brachytherapy Journal Study Is Published

66. On May 19, 2015, the results of a study entitled "Analysis of Stereotactic Radiation vs. Wedge Resection vs Wedge Resection Plus Cesium-131 Brachytherapy in Early-stage Lung Cancer" (the "Brachytherapy Journal Study") were published online in *Brachytherapy*, an international and multidisciplinary journal that publishes original peer-reviewed articles and selected reviews on the techniques and clinical applications of interstitial and intracavitary radiation in the management of cancers. A copy of the Brachytherapy Journal Study is attached hereto as Exhibit A.

67. Traditionally, the standard of care for early stage non-small lung cancer is a surgical resection or lobectomy, a surgical procedure performed to remove one of the lobes of the lungs, followed by chemotherapy.

68. However, some patients are not candidates for a lobectomy because of health issues or other potential dangers associated with the procedure. Patients who are not candidates for a lobectomy may be offered a sub-lobar resection wedge resection, or segmental resection. But randomized studies had demonstrated inferior outcomes when wedge resections were undertaken, rather than a lobectomy in Stage 1 lung cancer.

69. In order to compensate for the shortfall, brachytherapy was proposed to improve treatment results. Another common treatment option is stereotactic body radiation for inoperable patients.

70. The purpose of the Brachytherapy Journal Study was to evaluate treatment outcomes for wedge resection ("WR"), WR plus brachytherapy



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

("WRB"), or stereotactic body radiation therapy ("SBRT") for early stage non-small lung cancer.

71. In order to conduct the Brachytherapy Journal Study, the authors retrospectively collected data on patients treated with WR, WRB, or SBRT. Cesium-131 was used in WRB group in patients with close or positive margins based on surgical assessment.

72. A total of 272 patients were included in the Brachytherapy Journal Study: (i) 123 patients treated with wedge resection alone; (ii) 52 patients treated with wedge resection plus IsoRay's Cesium-131 brachytherapy; and (iii) 97 patients treated with stereotactic body radiation therapy.

73. The Brachytherapy Journal Study summarized disease free survival, local control (meaning control of the tumor in the lung), and overall survival results between the three different treatment approaches.

74. The Brachytherapy Journal Study discounted disease free survival rates (that showed wedge resection plus brachytherapy with Cesium-131 as less effective than the other two approaches) because the results were "not accurate here (especially in the Cs-131 group) because it occurs near the tails of the Cs-131 and SBRT curves, which are unreliable in survival analysis." *Id*. at 4.

75. The Brachytherapy Journal Study concluded that "[l]ocal control (LC) was ***similar*** in the three groups" and was achieved in 92.2% for the wedge resection only group, 96.2% for the wedge resection plus brachytherapy with Cesium-131 group, and 95.5% for stereotactic body radiation therapy group. *Id*. (Emphasis added).


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

76. The Brachytherapy Journal Study also concluded that five-year overall survival was 97.7% in the wedge resection only group, 100% in the wedge resection plus brachytherapy with Cesium-131 group, and 89.6% in the SBRT group. Toxicity was similar in the three groups.

77. Consequently, the Brachytherapy Journal Study reported "***equivalent*** [local control] and [disease free survival] between the three treatment modalities for early stage lung cancer patients who are not candidates for lobectomy." *Id.* at 5. (Emphasis added).

78. The Brachytherapy Journal Study also observed that wedge resection plus brachytherapy with Cesium-131 "was ***equivalent*** to [wedge resection alone] in terms of [local control] and [disease free survival] suggesting that there is ***no benefit*** of adding brachytherapy [. . . .]" *Id.* (Emphasis added).

79. But the Brachytherapy Journal Study theorized that there ***could*** be a benefit of adding IsoRay's Cesium-131 brachytherapy "since brachytherapy was added to high-risk resections" although "this ***needs to be proved in a clinical trial***." *Id.* (Emphasis added).

80. The Brachytherapy Journal Study concluded that "for early stage lung cancer patients who are not candidates for lobectomy, ***either*** WR with Cs-131 brachytherapy (especially in patients that the surgeon evaluates to be a high risk resection) ***or*** SBRT may be preferred option compared with wedge alone." *Id.* at 6. (Emphasis added).

81. The authors also highlighted the "limitations of our study includ[ing] the retrospective nature of the analysis." *Id.*


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

82. The Brachytherapy Journal Study's abstract summary concluded that the three treatment options "are ***all*** excellent treatment options for patients with early stage non-small cell lung cancer that are not candidates for lobectomy." *Id*. at 1. (Emphasis added).

83. The study's abstract also noted that the authors "favor use of Cesim-131 [sic] brachytherapy" for "high risk [wedge resections]" but also cautioned that "[u]ntil a prospective randomized comparative study is done to evaluate the best treatment approach for early stage NSCLC, treatment selection should be based on a multidisciplinary team approach."

84. On May 19, 2015, IsoRay stock closed at $1.62 per share, virtually unchanged from the prior day's closing price. Approximately 1.356 million shares of IsoRay stock were traded on that day.

**II. The Class Period Begins**

85. The Class Period begins at 8:15 a.m. EST on May 20, 2015 when IsoRay issued a press release almost ***immediately*** following the online publication of the Brachytherapy Journal Study.

86. The press release touted the Brachytherapy Journal Study as the first major peer reviewed study showing improved results using IsoRay's Cesium-131 seeds in the treatment of lung cancer (the "May 20th Press Release"). The press release states in relevant part, as follows:

> **IsoRay's Cesium-131 Lung Cancer Treatment Reports 96% Success in Local Control and 100% Survival at 5 Years in High Risk Patients in Newly Published Report**



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

**Cesium-131's Outstanding Lung Cancer Results Take On Other Treatment Forms Including Stereotactic Radiation**

Richland, WA (May 20, 2015) — IsoRay, Inc. (NYSE MKT: ISR), a medical technology company and innovator in seed brachytherapy and medical radioisotope applications, today announced the on-line publication of the first major peer reviewed study showing improved results using IsoRay's Cesium-131 seeds in the treatment of lung cancer.

IsoRay CEO Dwight Babcock commented, "We are extremely excited to have our Cesium-131 isotope seeds and mesh used in the treatment of non-small cell lung cancers with such outstanding patient outcomes. Notable physicians, including the authors of this study, are seeking better solutions and outcomes for their patients. We are continuing to develop our product offerings internally with support from these industry leaders. With every success that has been reported, the medical community is rapidly becoming aware of the innovative alternative our Cesium-131 products offer to cancer patients."

Dr. Bhupesh Parashar MD, of Weill Cornel Medical College, is lead author of the publication titled: 'Analysis of Stereotactic Radiation vs. Wedge Resection vs Wedge Resection Plus Cesium-131 Brachytherapy in Early-stage Lung Cancer'. The study noted that the survival rate at 5 years was exceptional for the Cesium-131 group, which included many high risk patients, and Cesium-131 added no noticeable side effects. Treatment with Cesium-131 was performed at the time of the surgery as a single treatment, in contrast to another treatment option, external radiation, which requires numerous hospital visits. To review the report as published online as of May 19, 2015, please follow the link provided here:
http://www.sciencedirect.com/science/article/pii/S1538472115004559

Babcock said, "Published studies are the final step to commercialization as leaders in the medical arena recognize the important need for a new power-

> ful weapon in the battle against cancer. This latest publication, in conjunction with other recent published reports on metastatic brain cancer and gynecological cancers, are proving Cesium-131's time is now. Not only does Cesium-131 work but it is a single application providing improved quality of life for the patient."

87. The May 20th Press Release was false and misleading and omitted material information concerning the Brachytherapy Journal Study. Each particular false and misleading statement, and the reasons why such statements were false or misleading, is summarized in the Addendum attached to this complaint and incorporated herein by reference. In short, the statements made in the May 20th Press Release left investors with the patently false impression that the results from the Brachytherapy Journal Study were "outstanding" and "exceptional" with respect to Celsium-131.

88. The Company's press release summarizing the Brachytherapy Journal Study had an ***immediate*** effect on shares of IsoRay stock, which skyrocketed, opening at $2.10 per share, or 30% higher than the prior day's closing price.

89. The Company's stock price increased another $0.17, or 8% per share, in the first moment of trading alone. Approximately 48.356 million shares traded on May 20, 2015 representing almost ***35 times*** the volume of shares traded the previous day.

90. Subsequent articles published by numerous media outlets positively cited the Company's press release and its claims about the Brachytherapy Journal Study:

> Shares of IsoRay Inc. (ISR) skyrocketed more than 90% on Wednesday, following an on-line publication of the first major peer reviewed



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

> study, which revealed improved results of the company's Cesium-131 seeds in the treatment of lung cancer.
>
> Cesium-131 is FDA-cleared and holds a CE mark for international sales in seed form for the treatment of brain cancer, prostate cancer, lung cancer, ocular melanoma cancer, colorectal cancer, gynecologic cancer, head and neck cancer and other cancers throughout the body.
>
> According to the publication titled "Analysis of Stereotactic Radiation vs. Wedge Resection vs Wedge Resection Plus Cesium-131 Brachytherapy in Early-stage Lung Cancer", Cesium-131 demonstrated 96% success in local control and 100% survival at 5 years in high risk patients.
>
> The study concludes that for high risk wedge resection (a type of lung cancer surgery), the use of Cesim-131 brachytherapy is a better choice.
>
> ISR touched a new high of $3.38 on Wednesday's before closing the day's trading 93.79% higher at $3.12.

http://www.rttnews.com/2501982/isr-in-all-its-radiance-gnca-s-herpes-drug-meets-trial-goal-amag-on-a-high.aspx.

91. As the positive news of the May 20 Press Release spread among IsoRay investors, IsoRay stock reached an intra-day high of $3.35 per share at 3:32 p.m., approximately ***76% higher*** than its opening price that day, and ***107% higher*** than its closing price the previous day (prior to the May 20th Press Release).

92. By the end of trading, shares of IsoRay had closed at $3.12 per share, or ***92% higher*** than the prior day.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

93. The following morning, buoyed by the positive momentum, IsoRay shares opened even higher at $3.51 per share, ***116% higher*** than the May 19th closing price of $1.62 per share. By 9:35 a.m. Eastern Time, just five minutes after the market opened, IsoRay reached its intra-day high of $3.79 per share, ***134% higher*** than the May 19th closing price of $1.62 per share.




94. IsoRay shares had not closed at these levels since 2007.

## III. The Class Period Ends

95. At approximately 11:36 a.m. Eastern Time, Adam Feuerstein, senior columnist for well-known investment website The Street (www.thestreet.com, the "premier destination for the latest financial news, quotes and money-related tools that help you become a smarter and more successful manager of your finances")



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

published an article entitled "IsoRay Takes Liberties with Lung Cancer Study Results to Prop Up Drug Price."

96. The article disclosed, for the first time, that IsoRay had selectively reported the conclusions set forth in the Brachytherapy Journal Study, omitting critical and material comparisons and conclusions.

97. The article reported, in relevant part, as follows:

> **IsoRay Takes Liberties With Lung Cancer Study Results to Prop Up Stock Price**
>
> RICHLAND, Wash. (TheStreet) – IsoRay does a poor job selling radioactive "seeds" for use in cancer radiation therapy. To make up for the inability to deliver revenue growth – and prop up its stock price – IsoRay issues a lot of promotional press releases, some of which take liberties with clinical data using clever, selective editing.
>
> Take Wednesday's IsoRay announcement about the publication of a study involving use of the company's seed brachytherapy product Cesium-131 to treat patients with early-stage lung cancer after surgery. The press release headline reads, "IsoRay's Cesium-131 Lung Cancer Treatment Reports 96% Success in Local Control and 100% Survival at 5 Years in High Risk Patients in Newly Published Report."
>
> 100% survival! That's an attention grabber. The IsoRay press release about the study goes on to describe the Cesium-131 results as "outstanding." Twice.
>
> IsoRay shares almost doubled in price to $3.12 Wednesday. The stock is up another 3% Thursday.

Few investors are reading the actual study involving Cesium-131 published in the medical journal Brachytherapy. If they read the study – and I did – you'd see IsoRay is lazy with the facts.

Yes, 96% of lung cancer patients demonstrated "local control" (meaning control of tumor in the lung) following surgery plus treatment with Cesium-131. But two other groups of lung cancer patients in the Brachytherapy study who had either surgery alone or a different form of radiation therapy demonstrated statistically equivalent rates of local control. The study authors note there were no differences in local control rates between the groups of lung cancer patients.

IsoRay also plays rope-a-dope with the five-year overall survival rate of 100% for Cesium-131 patients. The company fails to mention the comparable five-year survival rate for patients undergoing surgery alone is 98% – a clinically meaningless difference of two percentage points. Moreover, the survival analysis is severely limited because nearly every patient in the study is censored, meaning they're lost to follow up. The study does not conclude that treatment with Cesium-131 leads to longer survival.

In their conclusion, the study authors do not endorse IsoRay's Cesium-131 or call the results "outstanding." They conclude that early-stage lung cancer patients may benefit from surgery plus Cesium-131 or an the [sic] alternative form of radiation therapy compared to surgery alone.

Why would IsoRay provide selectively edited findings from a published which make its product seem better than it really is?

This chart of IsoRay's revenue growth for the past three years, dating back to when the company started selling Cesium-131, answers the question well.


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

(Emphasis added).

98. ***Immediately*** following the publication of the article, IsoRay stock plummeted over 20% (from $2.84 at 11:36 a.m. to $2.26 at 12:36 p.m.).

99. Throughout the day, IsoRay's share price continued to fall, closing at $2.01, or ***46% lower*** than its Class Period high of $3.79.

100. Total volume of shares traded that day was 52.116 million, or over ***37 times*** the volume on the day prior to the start of the Class Period.

101. IsoRay stock quickly returned to its pre-Class Period trading levels within several days of the publication of the article revealing IsoRay's false and misleading May 20th Press Release, and has traded at pre-Class Period levels thereafter.






LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

102. On May 22, 2015, Adam Feurstein, author of the TheStreet.com article reported, via Twitter, that "$ISR tried to raise money yesterday, too, according to investor source."[7]

103. A subsequent analysis of the Brachytherapy Journal Study was published on the Cancer Network (www.cancernetwork.com, the home of the journal *Oncology*), which provided a ***markedly different*** summary of the study:

> **Resection, Cs131, SBRT All Strong Options for Early-Stage Lung Cancer**
>
> **By Cancer Network Staff**
>
> An analysis of treatment possibilities for early-stage non–small-cell lung cancer (NSCLC) found that wedge resection (WR), WR with Cesium-131 (Cs131) brachytherapy, and stereotactic body radiation therapy (SBRT) ***are all*** "excellent options." In higher-risk WRs, the study found that the additional use of Cs131 ***may be*** beneficial.
>
> "If a patient cannot undergo lobectomy as the primary treatment, it has been suggested that WR should be combined with brachytherapy to achieve results equivalent to lobectomy," wrote study authors led by Bhupesh Parashar, MD, of Weill Cornell Medical College in New York. Parashar reported receiving funding support from IsoRay, which makes the Cs131 brachytherapy isotope.
>
> The study was a retrospective analysis of 272 patients treated with WR alone (123 patients), WR and Cs131 brachytherapy (52 patients), or SBRT (97 patients); all were treated between 1993 and 2012. Cs131 was used when surgeons deemed the WR procedure "high

---

[7] https://twitter.com/adamfeuerstein/status/601724166102974464.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

risk," such as for those with close or positive margins. Results of the study were published in *Brachytherapy*.

***The rates of local control were similar***, at 92.2% for WR, 96.2% for WR and Cs131, and 95.5% for SBRT (*P* = .60). There were also ***no differences when each individual group was compared to one other group***.

Disease-free survival rates at 5 years were also ***not significantly different***, at 50.5% for WR alone, 50.7% for WR and Cs131, and 46.9% for SBRT (*P* = .28).

Overall survival rates, however, were different. The median overall survival at 5 years was 100% in the WR and Cs131 group, compared with 97.7% in the WR alone group and 89.6% in the SBRT group (*P* = .02). The authors noted, though, that ***the lower survival in the SBRT group could be a result of selection bias***, with those with more comorbidities being selected to receive that treatment.

They also wrote that though the similarity in result with WR alone and with Cs131 brachytherapy suggests no benefit by adding Cs131, "this may not be the case since brachytherapy was added to high-risk resections." Those patients are generally at higher risk for local recurrence with no additional treatment.

***The authors stressed that definitive answers will require a randomized prospective trial***, but these results show that all three treatments are good options for early-stage lung cancer when lobectomy is not an option. Adding Cs131 brachytherapy to WR is recommended when the resection is deemed to be high risk by a surgeon.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

(Emphasis added).[8]

## NO SAFE HARBOR

104. The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

105. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Individual Defendant is liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of IsoRay who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Individual Defendant was an assumption underlying or relating to any plan,

---

[8] http://www.cancernetwork.com/lung-cancer/resection-cs131-sbrt-all-strong-options-early-stage-lung-cancer.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of IsoRay during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IsoRay's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by IsoRay or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

108. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

109. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IsoRay; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

111. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION / ECONOMIC LOSS

112. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated IsoRay's stock price and operated as a fraud or deceit on purchasers of IsoRay stock by misrepresenting



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

the Company's business. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, IsoRay's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of IsoRay stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

113. The Defendants' false and misleading statements had the intended effect and caused IsoRay stock to trade at artificially inflated levels throughout the Class Period.

114. As investors and the market became aware of IsoRay's prior misstatements and omissions and that IsoRay's actual financial condition and business prospects were, in fact, not as represented, IsoRay's stock price reacted negatively, damaging investors.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

115. At all relevant times, the market for IsoRay's common stock was an efficient market for the following reasons, among others:

(a) IsoRay is currently listed and actively traded on the NYSE, a highly efficient and automated market;

(b) During the class period, on average, several hundreds of thousands of shares of IsoRay stock were traded on a weekly basis, demonstrating a very active and broad market for IsoRay and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, IsoRay filed periodic public reports with the SEC;


LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

(d) IsoRay regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) IsoRay was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f) Numerous FINRA member firms were active market-makers in IsoRay stock at all times during the Class Period; and

(g) Unexpected material news about IsoRay was rapidly reflected and incorporated into the Company's stock price during the Class Period.

116. As a result of the foregoing, the market for IsoRay's common stock promptly digested current information regarding IsoRay from all publicly available sources and reflected such information in IsoRay's stock price. Under these circumstances, all purchasers of IsoRay's common stock during the Class Period suffered similar injury through their purchase of IsoRay's common stock at artificially inflated prices, and a presumption of reliance applies.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

## FIRST CLAIM

## Violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants

117. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118. This claim is brought against IsoRay and the Individual Defendant.

119. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (2) cause plaintiffs and other members of the Class to purchase IsoRay's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

120. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for IsoRay's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

121. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IsoRay as specified herein.

122. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IsoRay's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about IsoRay and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of IsoRay's common stock during the Class Period.

123. The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendant was a high-level executive, director, and agent at the Company during the Class Period and members of the Company's management team or had control thereof; (2)the defendant, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) the defendant enjoyed significant personal contact and familiarity with the company and its of-



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

ficers and directors and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) the defendant was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

124. Defendant had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IsoRay's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendant's Class Period misstatements and omissions , Defendant, if he did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

125. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of IsoRay's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of IsoRay's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired IsoRay common stock during the Class Period at artificially high prices and were or will be damaged thereby.

126. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding IsoRay's false statement which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their IsoRay common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

127. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

128. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

129. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

## SECOND CLAIM

## Violation of Section 20(a) of the Exchange Act

## against the Individual Defendant

130. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

131. The Individual Defendant acted as a controlling person of IsoRay within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, agency, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading. The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

132. In particular, Defendant Babcock had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

133. As set forth above, IsoRay Defendant Babcock violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

134. By virtue of his position as a controlling person, Defendant Babcock is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendant Babcock's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

135. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.



LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 16, 2015

Respectfully submitted,

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
*/s/ Cliff Cantor*
Cliff Cantor, WSBA # 17893
627 208th Ave. SE
Sammamish, WA 98074
Tel: (425) 868-7813
Fax: (425) 732-3752
Email: cliff.cantor@outlook.com

*Liaison Counsel for Plaintiffs*

THE ROSEN LAW FIRM, P.A.
*/s/ Phillip Kim*
Laurence M. Rosen
Phillip Kim (admitted *pro hac vice*)
Sara Fuks (admitted *pro hac vice*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel: (212) 686-1060-2610
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

*Lead Counsel for Plaintiffs*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
*/s/ Matthew M. Guiney*
Matthew M. Guiney (admitted *pro hac vice*)
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600

Email: Guiney@whafh.com
*Lead Counsel for Plaintiffs*

Certificate of Service

I certify that, on the date stamped above, I caused this pleading and its attachments to be filed with the Clerk of the Court using the CM/ECF system, which will cause notice of filing to be sent to each party via email to their counsel of record.

/s/ Cliff Cantor, WSBA # 17893

**ADDENDUM TO**

**AMENDED COMPLAINT FOR VIOLATIONS OF**

**THE FEDERAL SECURITIES LAWS**

Master File No. 15-cv-5046-LRS

| **Speaker** | **Document** | **False or Misleading Statement** | **Reasons Why Statement Is False or Misleading** |
|---|---|---|---|
| IsoRay | May 20, 2015 Company Press Release | "IsoRay's Cesium-131 Lung Cancer Treatment Reports ***96% Success*** in Local Control [. . .] in Newly Published Report." (Emphasis added). | The statement omits the fact that the two alternative treatment options examined in the Brachytherapy Journal Study (wedge resection alone or stereotactic body radiation therapy) demonstrated statistically equivalent rates of local control. There were ***no differences*** in local control rates between the three groups of patients. Instead, "LC was similar in the three groups." *Id.* at 4. Indeed, "[t]here was no difference in LC rate comparisons between WR and WR+Cs-131." *Id.* The statement creates the false and misleading impression that Celsium-131 was found to provide an added benefit as compared to surgery alone or surgery plus full body radiation. |
| IsoRay | May 20, 2015 Company Press Release | "IsoRay's Cesium-131 Lung Cancer Treatment Reports [. . .] 100% Survival At 5 Years In High Risk Patients In Newly Published | The statement omits to disclose that the comparable five-year survival rate for patients undergoing surgery alone is 98% -- a clinically meaningless difference of two percentage points. The statement also omits to disclose that the survival analysis is severely limited because nearly every patient in the study is censored, meaning lost to follow up. Furthermore, the Brachytherapy Journal Study does ***not*** conclude that treatment |

| | | | |
|---|---|---|---|
| | | Report." | with Cesium-131 leads to longer survival. The statement creates the false and misleading impression that the 100% survival rate after five years is attributable to patients having received Celsium-131 treatment when, in reality, patients undergoing wedge resection surgery alone fared statistically the same. |
| IsoRay | May 20, 2015 Company Press Release | "IsoRay [. . .] announced the online publication of the first major peer reviewed study showing ***improved results*** using IsoRay's Cesium-131 seeds in the treatment of lung cancer." (Emphasis added). | The Brachytherapy Journal Study does ***not*** show "improved results" using IsoRay's Cesium-131 seeds in the treatment of lung cancer. Instead, the study concludes that the three studied approaches are "all excellent treatment options" and noted that study results could indicate that "there is ***no benefit*** of adding brachytherapy [. . . .]" *Id.* at 5. (Emphasis added). The study cautioned that conclusions concerning benefits associated with wedge resection using Cesium-131 brachytherapy would "need[ ] to be proved in a clinical trial." *Id.* The statement creates the false and misleading impression that the study demonstrated that Celsium-131 was a superior treatment, when in reality the study did not so conclude. |
| CEO Dwight Babcock | May 20, 2015 Company Press Release | "We are extremely excited to have our Cesium-131 isotope seeds and mesh used in the treatment of non-small cell lung cancers with such ***outstanding patient outcomes***." (Emphasis added). | Patient outcomes using Cesium-131 seeds were ***not*** "outstanding" but rather, merely consistent with other treatment approaches. The study ***never*** used the term "outstanding" ***or*** concluded that IsoRay's Cesium-131 brachytherapy treatment resulted in superior results. |

| | | | |
|---|---|---|---|
| IsoRay | May 20, 2015 Company Press Release | "The study noted that the survival rate at 5 years was ***exceptional*** for the Cesium-131 group [. . . .]" (Emphasis added). | The study did ***not*** conclude that the survival rate was exceptional and did ***not*** conclude that treatment with Cesium-131 led to longer survival. The study ***never*** used the term "exceptional." Instead, the study concluded that ***all three approaches*** were "excellent treatment options" (*id*. at 1) and that ***either*** "WR with Cs-131 brachytherapy or SBRT may be preferred option compared with wedge alone." *Id*. at 6. This statement omits to disclose the fact that the five year survival rate for the Celsium-131 was virtually indistinguishable from the 5 year survival rates for patients who were treated with wedge resection alone. |
| IsoRay | May 20, 2015 Company Press Release | The Brachytherapy Journal Study represented the "first major peer reviewed study" concerning Cesium-131 in this context. | The press release failed to disclose that IsoRay provided funding to the report's author, Dr. Bhupesh Parashar, in connection with the study itself creating the misleading impression that researchers were affirmatively seeking to study IsoRay's Celsium-131 brachytherapy seeds. |

ELSEVIER

Brachytherapy 14 (2015) 648−654

BRACHYTHERAPY

# Analysis of stereotactic radiation vs. wedge resection vs. wedge resection plus Cesium-131 brachytherapy in early stage lung cancer

Bhupesh Parashar[1,4,*], Jeffery Port[2,4], Shruthi Arora[1], Paul Christos[3], Samuel Trichter[1], Dattatreyudu Nori[1], A. Gabriella Wernicke[1]

[1]Department of Radiation Oncology, Weill Cornell Medical Center, New York
[2]Department of Cardiothoracic Surgery, Weill Cornell Medical Center, New York
[3]Department of Biostatistics, Weill Cornell Medical Center, New York

**ABSTRACT**

**PURPOSE:** The purpose of the study was to evaluate the outcomes for wedge resection (WR), WR plus brachytherapy (WRB), or stereotactic body radiation therapy (SBRT) for early stage non-small lung cancer.

**METHODS AND MATERIALS:** Retrospectively collected data of patients treated with WR, WRB, or SBRT (1993−2012). Cesium-131 (Cs131) used in WRB group in patients with close or positive margins based on surgical assessment. Kaplan−Meier survival analysis, log-rank test used to compare disease-free survival/overall survival between different groups. Multivariable analysis, using Cox proportional hazards regression analysis, was performed to evaluate the independent effect of age, gender, and treatment procedure on disease-free survival.

**RESULTS:** A total of 272 patients were included in the study (123 WR, 52 WR+Cs-131, 97 SBRT). Cs-131 was used with WRs that the surgeons deemed high risk. Local control (LC) was similar in the three groups and was achieved in 92.2% for WR group vs. 96.2% for WR+Cs-131 and 95.5% for SBRT ($p = 0.60$). On multivariate analysis, although females showed a higher LC, neither LC nor distant metastasis were associated with age or gender ($p = 0.65$ and $p = 0.41$, respectively). Five-year overall survival was 100% in the WR+B group, 97.7% in the WR group, and 89.6% in the SBRT group ($p = 0.02$). Toxicity was similar in the three groups.

**CONCLUSION:** WR, WR+ Cs-131, or SBRT are all excellent treatment options for patients with early stage non-small cell lung cancer that are not candidates for lobectomy. For high risk WRs, we favor use of Cesim-131 brachytherapy. Until a prospective randomized comparative study is done to evaluate the best treatment approach for early stage NSCLC, treatment selection should be based on a multidisciplinary team approach. © 2015 American Brachytherapy Society. Published by Elsevier Inc. All rights reserved.

*Keywords:* Cesium-131; SBRT; Lung; Wedge; Brachytherapy

## Introduction

The standard of care for management of early stage non-small cell lung cancer (NSCLC) is surgical resection (lobectomy) followed by chemotherapy in select patients (1). Patients that are not candidates for a lobectomy may be offered a sub-lobar resection wedge resection (WR) or segmental resection. However, a randomized study demonstrated inferior outcomes when WR is used instead of a lobectomy in Stage I lung cancer (2).

To compensate for less extensive surgical resection, radiation seed implantation (brachytherapy) has been proposed to improve local control (LC) rates. Therefore, if a patient cannot undergo a lobectomy as the primary treatment, it has been suggested that WR should be combined with brachytherapy to achieve results equivalent to lobectomy. There have been retrospective studies reporting excellent LC rates in early stage lung cancer using WR+B as a treatment option (3), although others have reported

Received 5 November 2014; received in revised form 15 March 2015; accepted 1 April 2015.

Funding: Isoray to Bhupesh Parashar, MD.

Other authors: There are no financial disclosures, conflicts of interest, and/or acknowledgments for the authors.

* Corresponding author. Department of Radiation Oncology, Weill Cornell Medical Center, New York, NY 10021. Tel.: +1-212-746-3612; fax: +1-212-746-8749.

*E-mail address:* bup9001@med.cornell.edu (B. Parashar).

[4] Both authors contributed equally.

1538-4721/$ - see front matter © 2015 American Brachytherapy Society. Published by Elsevier Inc. All rights reserved.
http://dx.doi.org/10.1016/j.brachy.2015.04.001

excellent LC rates using WR alone and recommend that brachytherapy is not needed as an additional local treatment (9).

In addition to the aforementioned treatment options for early stage lung cancer, stereotactic body radiation therapy (SBRT) has been used as a primary treatment for patients who are considered inoperable. SBRT involves delivery of high-dose radiation (without the need for surgery) to the cancerous nodule in 3–5 sessions (vs. 6–7 weeks in conventional radiation). Several prospective and retrospective studies have shown excellent LC and overall survival (OS) rates that are equivalent to surgical resection (lobectomy or sub-lobar resection) (4–7).

The aim of our study was to evaluate outcomes between these three non-lobectomy treatment modalities.

## Methods

This is an Institutional Review Board approved chart review study. Patients with NSCLC, treated at our institution (1993–2012), were selected for a retrospective analysis. Patients were considered to be candidates for WR, WR+B, or SBRT if they were not candidates for a lobectomy (based on their pulmonary functions, prior medical history, and performance status). Of the staged patients, all were Stage I for the site of disease treated. Patients with pure ground glass opacities were excluded. In all cases, pre-treatment assessment included a history, physical examination, routine blood work, electrocardiogram, pulmonary function test, and a CT of the chest and upper abdomen. A comprehensive cardiac evaluation was performed in patients considered at risk based on history, clinical examination, or electrocardiogram findings. Patients who underwent SBRT were only included if they met the criteria for inoperability.

### *Stereotactic body radiation therapy*

SBRT use for lung cancer in our department began after 2002. Patients considered for SBRT were routinely discussed in a multi-disciplinary conference with thoracic surgical input. Patients selected for SBRT most commonly fell into the following groups. In one group, SBRT was preferred despite adequate cardio-pulmonary function because the combination of prior lobar resection(s) and a new central lesion would have mandated a completion pneumonectomy. The second group had adequate cardio-pulmonary reserve for a limited resection, however, were not candidates due to the centrality of their lesions. Other criteria for patient selection for SBRT included multiple prior surgeries, severe cerebral, peripheral vascular and cardiovascular disease, diabetes mellitus with severe end organ damage, or if the patient declined surgery.

SBRT was delivered with extra-cranial stereotactic targeting techniques in conjunction with a stereotactic body frame from Elekta. The planning target volume (PTV) was based on the clinical target volume plus a margin to allow for target movement obtained through 1 cm uniform expansion of the clinical target volume. More recently, 4-D CT has been utilized. Four-dimensional CT scanning with 2.5 mm intervals around the tumor was performed during normal breathing, with the expiratory phase images used for planning. The mass on expiratory phase CT was defined as the internal target volume. The setup margins between internal target volume and PTV were 5 mm in other directions. The leaf margin to PTV was 8 mm in all directions. The beam energy was 6 MV, and seven to eight portals for non-coplanar static beams were used. The Pinnacle planning system (Philips, Pinnacle, MA, USA) was used. Critical structures were outlined. The prescription was based on a percentage isodose line that encompasses PTV, with 100% set at the isocenter. The median dose to the tumor was 48 Gy (range, 30–60 Gy) over 4 fractions (range, 3–5). Patients were followed after treatment by CT or PET-CT every 6 months.

### *Wedge resection*

WR were performed in two groups of patients, all of whom presented with peripherally located tumors. The first group included patients with adequate pulmonary function but with a history of prior lobar resection (other than middle lobectomy). Patients in the second group had borderline cardio-pulmonary reserve precluding lobar resection. Mediastinoscopy was performed at the discretion of the surgeon.

### *Brachytherapy*

Patients who underwent WR+B had intraoperative implantation of radiation seeds. Brachytherapy was added to high-risk resections, such as those with suspected close or positive margins (as assessed by the surgeons). The decision to offer intraoperative brachytherapy was determined by the surgeon's assessment of the adequacy of the surgical margin by wedge alone. This determination was done mostly before surgery based on imaging and occasionally during surgery. WR were performed with curative intent and with a margin equal to the diameter of the tumor or at least a 1 cm margin. WR was performed by both video-assisted thoracoscopy and thoracotomy depending on tumor depth, location, re-operation, and the year of the resection. Brachytherapy was performed using either a mesh or a "double-suture" method at the discretion of the operating surgeon and radiation oncologist. Patients underwent gross removal of the tumor in the operating room (OR) after which the radiation oncologist placed the suture seeds on the tumor bed. In the mesh technique, the area to be implanted is measured and suture seeds are secured to a vicryl mesh. The seeds are placed at a

distance of 0.5–1.0 cm using the nomogram developed for Cs-131 planar implants. The area of the mesh is determined to deliver a dose of 80 Gy at 0.5 cm from the implant surface. In the "double-suture" technique, suture seeds are placed 0.5–1 cm apart directly on the tumor bed without the use of a vicryl mesh. This method was determined to be convenient in case of video-assisted thoracoscopic surgical resections for lung cancer. The prescription dose was 80 Gy at 0.5 cm from the wedge line for Cs-131. Rationale for this prescription dose is as follows: The Cs-131 prescribed dose determination is based on the linear-quadratic formulation where assumptions are made regarding the $\alpha/\beta$ ratios for late responding and lung tissue ($\alpha/\beta = 3$ for lung tissue/late responding tissue, 10 for cancer), tissue repair constant, average tumor doubling time (approximately 166 days), repopulation rates, and so on. If they are similar to I-125 (almost similar energy), and radiobiological effectiveness similar to I-125 is assumed (1.0–1.45), then matched tumor effects can be expected in the range of 80–120 Gy, especially because of significantly higher dose rate. Median Cs-131 seed activity was 2.4 U (mGym$^2$/h) (range, 2.2–2.4). Dosimetric calculations were performed on the post-implant CT scan performed within 1 week for dosimetric calculations. This CT scan showed all patients with seeds intact (no seed migration) and conformal to the tumor bed.

### Recurrence

Recurrence in our study was defined as local, if there was recurrent tumor at the primary site, staple line, or involved lobe. Regional recurrence was defined as tumor recurrence in the ipsilateral uninvolved lobe or ipsilateral hilar and mediastinal nodes. Distant recurrences were defined as any disease in contralateral nodes or distant sites. In the surgical group, all recurrences were confirmed cytologically or histologically. Recurrences in the SBRT group were pathologically confirmed.

### Followup

Followup was obtained through routine office visits or via telephone contact. Patients were routinely followed by CT scan of the chest and if clinically warranted a PET scan was obtained. All patients were followed through November 2013.

### Data collection

Demographic data collected included age, gender, and clinical stage. Medical comorbidity was assessed by the Charlson Comorbidity Index. Complications were graded based on the National Cancer Institute common terminology criteria for adverse events version 4, 2009. Patients were staged according to the American Joint Committee on Cancer 7th ed. guidelines.

### Statistics

Descriptive statistics (including mean, standard deviation, median, range, frequency, percentage) were calculated to characterize the study cohort in relation to demographic, prognostic, and treatment factors of interest. The primary endpoint was disease-free survival (DFS). DFS was defined as the time from treatment procedure until tumor recurrence or death from any cause (or until date of last followup if no tumor recurrence/death from any cause). OS was defined as the time from treatment procedure until death from any cause (or date of last followup if no death from any cause).

Kaplan–Meier survival analysis was performed to evaluate DFS and OS, and the log-rank test was used to compare DFS/OS between different prognostic/treatment groups of interest (i.e., age, gender, and treatment procedure). Multivariable analysis, using Cox proportional hazards regression analysis, was performed to evaluate the independent effect of age, gender, and treatment procedure on DFS. Stage could not be included in the multivariable analysis due to the small number of Stage II-IV patients. All $p$-values are two-sided with statistical significance evaluated at the 0.05 alpha level. Ninety-five percent confidence intervals (CIs) for adjusted hazard ratio (HR) were calculated to assess the precision of the obtained estimates. All analyses were performed using SPSS version 22.0 (SPSS Inc., Chicago, IL).

## Results

A total of 272 patients were included in the study. There were 123 treated with WR, 52 with WR+Cs-131, and 97

Table 1
Patient and tumor characteristics

| | WR (%) | WR+Cs 131 (%) | SBRT (%) |
|---|---|---|---|
| No of patients | 123 | 52 | 97 |
| Sex | | | |
| Females | 70 (56.9) | 36 (69.2) | 56 (57.8) |
| Males | 53 (43.1) | 16 (30.8) | 41 (39.2) |
| Most common site | Right upper lobe (28.5) | Right upper lobe (38.6) | Right upper lobe (33) |
| Radiation dose | — | 80 Gy at 0.5 cm | Median 48 Gy (12 Gy x 4) (range, 30–60 Gy) |
| No of seeds | — | 20 (range, 10–50) | — |

Table 2
Tumor histology

| Histology | Total number (%) |
|---|---|
| Adenocarcinoma | 185 (68) |
| Squamous cell carcinoma | 37 (13.6) |
| Small cell carcinoma | 1 (.36) |
| Other NSCLC | 37 (13.6) |
| Missing | 12 (4.4) |

NSCLC = non-small cell lung cancer.

with SBRT. Median age was 77 years (range, 40–96 years). Overall, there were 162 females and 110 males. Of the staged patients, all were Stage I for the site of disease treated. Patient and tumor characteristics are shown in Table 1. Tumor histology of the entire cohort is displayed in Table 2.

With a median followup of 17.5 months, overall LC was seen in 228 patients (83.8%); however, 45 patients developed distant failure (DF) (16.5%). One hundred seventy-two patients (63%) were no-evidence of disease at the last followup.

*Disease-free survival*

Median DFS was 64.4 months for WR, 30.8 months for WR+Cs-131, and 81 months for SBRT, and the 5-year DFS was 50.5%, 50.7%, and 46.9%, respectively ($p$ = 0.28) (Fig. 1). Median DFS is not accurate here (especially in the Cs-131 group) because it occurs near the tails of the Cs-131 and SBRT curves, which are unreliable in survival analysis.

*Local control*

LC was similar in the three groups and was achieved in 92.2% for WR (median followup 25 months) group vs. 96.2% for WR+Cs-131 (median followup 14 months) and 95.5% for SBRT (median followup 24 months) ($p$ = 0.60). There was no difference in LC rate comparisons between WR and WR+Cs-131 ($p$ = 0.50) or WR+Cs-131 vs. SBRT ($p$ = 0.99).

*Distant failure*

There was no difference in the DF rates between the three treatment groups. DF was seen in 19.6% for WR, 13.5% for WR+Cs-131, and 20.5% for SBRT groups ($p$ = 0.56).

*Multivariate analysis for prognostic factors affecting outcome*

Females showed a higher LC than men (98% vs. 88.3% in females and males, respectively, $p$ = 0.002), although DF rate was similar in both sexes (17.6% vs. 20.2% in females and males, respectively, $p$ = 0.61).

However, median DFS was not statistically different between the two sexes ($p$ = 0.76) with a 5-year DFS of 41.9% and 53.2% in females and males, respectively (Fig. 2).

LC and distant metastasis showed no association with age ($p$ = 0.65 and $p$ = 0.41, respectively).

LC was higher in Stage I vs. higher stages ($p$ = 0.04), and distant control also showed a higher trend toward Stage I ($p$ = 0.07).

*Overall survival*

Median OS at 5 years for the entire cohort was 92.8%. Five-year OS was 100% in the WR+B group, 97.7% in the WR group, and 89.6% in the SBRT group ($p$ = 0.02) (Fig. 3).




Fig. 1. Disease-free survival by treatment modality.




Fig. 2. Disease-free survival by gender.




Fig. 3. Overall survival by treatment modality.

*Toxicity*

There were very few Grade III/IV toxicities in the entire cohort. There was one patient with Grade III pneumonitis after SBRT and one patient with pulmonary embolus (Grade IV, WR, or WR+Cs-131) in the surgical group (Table 3).

## Discussion

Our study has shown an equivalent LC and DFS between the three treatment modalities for early stage lung cancer patients who are not candidates for lobectomy. Lower survival in the SBRT group could be a result of patient selection bias (patients selected to SBRT group because of co-morbid conditions).

Although WR+Cs-131 was equivalent to WR in terms of LC and DFS suggesting that there is no benefit of adding brachytherapy, this may not be the case since brachytherapy was added to high-risk resections, such as those with suspected close or positive margins (as assessed by the surgeons). Such patients with close/positive margins are at increased risk of local recurrence if no additional treatment is added. In a study published from Boston (8), the overall, unadjusted 1- and 2-year local recurrences rate was 5.7% and 11.0%, respectively. From the adjusted analyses, an increased margin distance was significantly associated with a lower risk of local recurrence ($p = 0.033$). Patients with a 10-mm margin distance had a 45% lower local recurrence risk than those with a 5-mm distance (HR, 0.55; 95% CI, 0.35–0.86). This may suggest that since WR+Cs-131 is equivalent to WR alone in terms of LC, Cs-131 was likely the reason for LC equivalence since these patients normally have a higher local recurrence rate, although this needs to be proved in a clinical trial.

In a recent study, high-risk operable patients with NSCLC < 3 cm were randomly assigned to subtotal resection (SR) or subtotal resection plus brachytherapy (SRB). The trial was designed to have a 90% power to detect a HR of 0.315 in favor of SRB, using a one-sided Type I error rate of 0.05 with a sample size of 100 eligible patients in each arm (9). Iodine-125 was used as the radioisotope for brachytherapy. LR rates at 5 years of followup were 14.0% and 16.7% in the SR and SRB arms, respectively ($p$ value = 0.59). The pattern of LR, in particular local progression, was not significantly different between the arms. Notably, local progression occurred in only 17 (7.7%) of 222 patients (95% CI, 4.5%–12.0%) after surgery. LR rates at 2 and 3 years were 12.3% and 12.3%, respectively, in the SR arm and 9.3% and 12.0%, respectively, in the SRB arm and were not significantly different ($p = 0.47$ at 2 years, $p = 0.96$ at 3 years). Patients deemed to be at higher risk for LR included those with a margin less than 1 cm, margin-to-tumor ratio less than 1, positive staple line cytology, or clinical nodule size greater than 2 cm and those who underwent wedge rather than segmental resection. There was a trend favoring SRB among 14 patients who had positive staple line cytology (HR, 0.22); however, no statistically significant differences were found. However, as acknowledged by the authors, this finding may have been related to closer attention to parenchymal margins by surgeons participating in this study.

Although, lobectomy remains the treatment of choice for early stage lung cancer, 20%–25% of patients with early stage lung cancer are not considered candidates for lobar resection because of concomitant severe medical comorbidities or previous lung resection (10). Results from conventional radiation for early stage lung cancer as a primary treatment have been disappointing and were inferior to surgical outcomes (11). Over the past few years, SBRT has emerged as a promising new modality for the treatment of a number of solid tumors, including early stage lung cancer in medically inoperable patients. Recently, there have been several reports of high LC at 3 years in the 80%–99% range that have established SBRT as a standard of care in the medically inoperable patient (12–18).

Table 3
Adverse events

| Morbidity | Severity | Surgery |
|---|---|---|
| **a. Surgery (wedge/wedge plus brachytherapy)** | | |
| Air leak | Grade-I | 7 (4%) |
| Pneumonia | Grade-II | 2 (1%) |
| a-fib | Grade-I, II | 5 (3%) |
| Pulmonary embolus | Grade-IV | 2 (1%) |
| Morbidity | Severity | SBRT |
| **b. SBRT** | | |
| Fatigue | Grade-I | 58 (60.5%) |
| Chest pain | Grade-II | 4 (4.0%) |
| Pneumonitis | Grade-III | 2 (1.5%) |
| N/A | | 33 (34%) |

SBRT = stereotactic body radiation therapy, N/A = not available.

Although the role of SBRT in in-operable patients is well established, its role in operable patients is under investigation. There are currently no randomized data available to compare SBRT and surgery in the operable patient. However, there are single arm prospective and retrospective studies suggesting non-inferiority of SBRT to surgery. In the analysis of a database of lung cancer patients treated with SBRT who were potentially operable (19), a dose of 60 Gy was delivered using a risk-adapted scheme in 3, 5, or 8 fractions, depending on tumor size and location (T1–T2). The median followup was 31.5 months, and median OS was 61.5 months, with 1- and 3-year survival rates of 94.7% and 84.7%, respectively.

In a Japanese multicenter study (4), 180 patients received SBRT. Of these, 120 were inoperable and 60 were operable. For tumors that measured <1.5 cm, 1.5–3.0 cm, and >3.0 cm in greatest dimension, radiation doses of 44 Gy, 48 Gy, and 52 Gy, respectively, were given in four fractions. The 3-year survival rate was 74% for operable patients and 59% for medically inoperable patients (p ¼ 0.080). The 3-year LC rate was 86% for tumors 3 cm and 73% for tumors >3 cm (p ¼ 0.050). Grade 2 radiation pneumonitis developed in 13% of patients.

In a Japanese prospective single arm study Nagata reported on 65 elderly, yet operable, Stage IA patients who underwent SBRT, 3 yr. OS was 76% and Grade 3 or above toxicities were acceptable (20). In the United States, a single institution, retrospective study, high-risk operable patients were treated with SBRT and compared with a non-matched surgical cohort that underwent WR. Cancer-specific survival was equivalent between groups with a non-significant trend toward an increase in local and regional control in the SBRT group (21). The surgical group had 38% locoregional failure rate in comparison to the 8% failure rate in SBRT. This could be a result of selection bias since patients were not staged adequately. A possible reason suggested by the authors for excellent outcomes with SBRT when compared with anatomic WR was because of the scatter radiation that may sterilize microscopic disease in the mediastinum (22). We used an SBRT median dose of 48 Gy in 4 fractions of 12 Gy. This dose has a biological equivalent dose (BED) of >100 Gy. This BED has been accepted as optimal for lesions <5 cm (15). Onishi *et al.* (15) retrospectively compared 57 patients with Stage I NSCLC (median age, 74 years: 164 T1N0M0, 93 T2N0M0), who were treated with HypoFXSRT alone at 14 institutions. Local progression occurred in 36 patients (14.0%), and the local recurrence rate was 8.4% for a BED of 100 Gy or more compared with 42.9% for less than 100 Gy ($p < 0.001$). A limitation in our SBRT planning is that 4D simulation was not available for patients treated before 2008. This may have resulted in larger target volumes, although the clinical implication of this is not clear.

Cost-effectiveness of SBRT vs. surgery has been compared (23). A Markov model was created to compare the cost-effectiveness of SBRT with WR and lobectomy for marginally operable (MO) and clearly operable (CO) patients, respectively. In the base case, SBRT (MO cohort), SBRT (CO cohort), WR, and lobectomy were associated with mean cost and quality-adjusted life expectancies of $42,094/8.03, $40,107/8.21, $51,487/7.93, and $49,093/8.89, respectively. In MO patients, SBRT was the dominant and thus cost-effective strategy. For CO patients, lobectomy was the cost-effective treatment option in the base case (incremental cost-effectiveness ratio of $13,216/quality-adjusted life year) and in nearly every sensitivity analysis. However, these calculations did not include brachytherapy costs.

Result from our retrospective analysis indicate that for early stage lung cancer patients who are not candidates for lobectomy, either WR with Cs-131 brachytherapy (especially in patients that the surgeon evaluates to be a high risk resection) or SBRT may be preferred option compared with wedge alone. This information is important since it may help a patient decide for a non-surgical treatment such as SBRT if they have to choose between WR and SBRT for an early stage lung cancer.

The limitations of our study include the retrospective nature of the analysis. This is the first report of analysis of these three treatment modalities for patients who cannot undergo lobectomy until the results of definitive randomized trials become available. However, until that happens, patients must be carefully evaluated by a multidisciplinary team that includes experienced thoracic surgeons, radiation oncologists, medical oncologists, and interventional radiologists so that these tremendous advances in technology can readily be translated into an actual benefit for our patients.

## Acknowledgment

Paul Christos was partially supported by the following grant: Clinical Translational Science Center (CTSC) (UL1-TR000457-06).

## References

[1] Allen MS, Darling GE, Pechet TT, *et al*. Morbidity and mortality of major pulmonary resections in patients with early-stage lung cancer; initial results of the randomized, prospective ACOSOG Z0030 trial. *Ann Thorac Surg* 2006;81:1013–1019.

[2] Ginsberg RJ, Rubinstein LV. Lung Cancer Study Group. Randomized trial of lobectomy versus limited resection for T1 N0 non-small cell lung cancer. *Ann Thorac Surg* 1995;60:615–622.

[3] Chen A, Galloway M, Landreneau R, *et al*. Intraoperative 125I brachytherapy for high-risk stage I non-small cell lung carcinoma. *Int J Radiat Oncol Biol Phys* 1999;44:1057–1063.

[4] Shibamoto Y, Hashizume C, Baba F, *et al*. Stereotactic body radiotherapy using a radiobiology-based regimen for stage I non- small cell lung cancer: A multicenter study. *Cancer* 2012;118:2078–2084.

[5] Timmerman R, Paulus R, Galvin J, *et al*. Stereotactic body radiation therapy for inoperable early stage lung cancer. *JAMA* 2010;303: 1070–1076.

[6] Haasbeek CJ, Lagerwaard FJ, Slotman BJ, Senan S. Outcomes of stereotactic ablative radiotherapy for centrally located early-stage lung cancer. *J Thorac Oncol* 2011;6:2036–2043.

[7] Baumann P, Nyman J, Hoyer M, *et al*. Outcome in a prospective phase II trial of medically inoperable stage I non-small-cell lung cancer patients treated with stereotactic body radiotherapy. *J Clin Oncol* 2009;27:3290–3296.

[8] Mohiuddin K, Haneuse S, Sofer T, *et al*. Relationship between margin distance and local recurrence among patients undergoing wedge resection for small (≤2 cm) non-small cell lung cancer. *J Thorac Cardiovasc Surg* 2014;147:1169–1175.

[9] Fernando HC, Landreneau RJ, Mandrekar SJ, *et al*. Impact of brachytherapy on local recurrence rates after sublobar resection: Results from ACOSOG Z4032 (Alliance), a phase III randomized trial for high-risk operable non-small-cell lung cancer. *J Clin Oncol* 2014;32:2456–2462.

[10] National Comprehensive Cancer Network (NCCN) Clinical Practice Guidelines in Oncology. Available at: http://www.nccn.org/professionals/physician_gls/PDF/nscl.pdf. Accessed February 11, 2015.

[11] Dosoretz DE, Katin MJ, Blitzer PH, *et al*. Radiation therapy in the management of medically inoperable carcinoma of the lung: Results and implications for future treatment strategies. *Int J Radiat Oncol Biol Phys* 1992;24:3–9.

[12] Zimmermann FB, Geinitz H, Schill S, *et al*. Stereotactic hypofractionated radiation therapy for stage I non-small cell lung cancer. *Lung Cancer* 2005;48:107–114.

[13] Fakiris AJ, McGarry RC, Yiannoutsos CT, *et al*. Stereotactic body radiation therapy for early-stage non-small-cell lung carcinoma: Four-year results of a prospective phase II study. *Int J Radiat Oncol Biol Phys* 2009;75:677–682.

[14] Nagata Y, Takayama K, Matsuo Y, *et al*. Clinical outcomes of a phase I/II study of 48 Gy of stereotactic body radiotherapy in 4 fractions for primary lung cancer using a stereotactic body frame. *Int J Radiat Oncol Biol Phys* 2005;63:1427–1431.

[15] Onishi H, Shirato H, Nagata Y, *et al*. Hypofractionated stereotactic radiotherapy (HypoFXSRT) for stage I non-small cell lung cancer: Updated results of 257 patients in a Japanese multi-institutional study. *J Thorac Oncol* 2007;2(7 Suppl 3):S94–S100.

[16] Filippi AR, Badellino S, Ceccarelli M, *et al*. Stereotactic ablative radiation therapy as first local therapy for lung oligometastases from colorectal cancer: A single-institution cohort study. *Int J Radiat Oncol Biol Phys* 2014;91:524–529. S0360–3016(14)04352-1.

[17] Koshy M, Malik R, Mahmood U, *et al*. Stereotactic body radiotherapy and treatment at a high volume facility is associated with improved survival in patients with inoperable stage I non-small cell lung cancer. *Radiother Oncol* 2015;114:148–154. S0167–8140(14)00585-4.

[18] Mak RH, Hermann G, Lewis JH, *et al*. Outcomes by tumor histology and KRAS mutation status after lung stereotactic body radiation therapy for early-stage non-small-cell lung cancer. *Clin Lung Cancer* 2015;16:24–32.

[19] Lagerwaard FJ, Verstegen NE, Haasbeek CJ, *et al*. Outcomes of stereotactic ablative radiotherapy in patients with potentially operable stage I non-small cell lung cancer. *Int J Radiat Oncol Biol Phys* 2012;83:348–353.

[20] Nagata Y, Hiraoka M, Shibata T, *et al*. A phase II trial of stereotactic body radiation therapy for operable T1N0M0 non-small cell lung cancer: Japan Clinical Oncology Group (JCOG0403). *Int J Radiat Oncol Biol Phys* 2010;78:s27–28.

[21] Grills IS, Mangona VS, Welsh R, *et al*. Outcomes after stereotactic lung radiotherapy or wedge resection for stage I non-small-cell lung cancer. *J Clin Oncol* 2010;28:928–935.

[22] Parashar B, Singh P, Christos P, *et al*. Stereotactic body radiation therapy (SBRT) for early stage lung cancer delivers clinically significant radiation to the draining lymph nodes. *J Radiosurg SBRT* 2013;2:339–340.

[23] Shah A, Hahn SM, Stetson RL, *et al*. Cost-effectiveness of stereotactic body radiation therapy versus surgical resection for stage I non-small cell lung cancer. *Cancer* 2013;1:3123–3132.

## PLAINTIFF'S CERTIFICATION

Bogdan Ostrowski ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in **IsoRay, Inc.** securities during the Class Period specified in the Complaint are as follows:

**SEE ATTACHED SCHEDULE A**

5. During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20 day of June 2015.

[signature]

Bogdan Ostrowski

**IsoRay, Inc.**
**Schedule A to certification of Bogdan Ostrowski**

**Purchases**

| Date | # of shares | Price/share |
|---|---|---|
| 05/21/15 | 20,000 | $3.00 |
| 05/21/15 | 30,000 | $3.10 |

## PLAINTIFF'S CERTIFICATION

Joseph Kavanagh ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in **IsoRay, Inc.** securities during the Class Period specified in the Complaint are as follows:

**SEE ATTACHED SCHEDULE A**

5. During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 day of July 2015.

Joseph Kavanagh

Joseph Kavanagh

**Schedule A to Certification of Joseph Kavanagh**
**IsoRay, Inc.**

**PURCHASES**

| Date | # Shares | Price/Share |
|---|---|---|
| 05/20/15 | 3,000 | $1.97 |
| 05/20/15 | 900 | $2.07 |
| 05/20/15 | 1,100 | $2.06 |
| 05/20/15 | 1,500 | $2.25 |
| 05/20/15 | 3,500 | $2.25 |
| 05/21/15 | 3,650 | $3.69 |
| 05/21/15 | 2,600 | $3.68 |
| 05/21/15 | 1,350 | $3.68 |
| 05/21/15 | 2,400 | $3.67 |
| 05/21/15 | 5,000 | $3.42 |

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against IsoRay, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The IsoRay, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Patrick
**Middle initial:** J
**Last name:** McNamara
**Address:** Redacted [redacted]
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 05/21/15 | 800 | 2.77 |
| Common Stock05/21/15 | 9400 | 2.71 | |
| Common Stock05/21/15 | 300 | 2.709 | |
| Common Stock05/21/15 | 300 | 2.705 | |
| Common Stock05/21/15 | 15000 | 2.58 | |
| Common Stock05/21/15 | 15000 | 2.58 | |
| Common Stock05/21/15 | 5200 | 2.40 | |
| Common Stock05/21/15 | 3100 | 2.39 | |
| Common Stock05/21/15 | 1700 | 2.385 | |
| Common Stock05/21/15 | 10000 | 2.32 | |
| Common Stock05/21/15 | 4900 | 2.79 | |
| Common Stock05/21/15 | 14540 | 2.785 | |

**Certification for Patrick McNamara (cont.)**

| | | |
|---|---|---|
| Common Stock05/21/15 | 4600 | 2.78 |
| Common Stock05/21/15 | 160 | 2.775 |
| Common Stock05/21/15 | 25000 | 3.09 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock05/21/15 | 240 | 3.23 | |
| Common Stock05/21/15 | 5000 | 3.21 | |
| Common Stock05/21/15 | 3200 | 3.20 | |
| Common Stock05/21/15 | 1000 | 3.199 | |
| Common Stock05/21/15 | 300 | 3.195 | |
| Common Stock05/21/15 | 15260 | 3.19 | |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 05/23/2015

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against IsoRay, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The IsoRay, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** JM
**Middle initial:**
**Last name:** Zulueta
**Address:** REDACTED [redacted]
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | May 21, 2015 | 10000 | 3.50 |
| Common StockMay 21, 2015 | 4250 | 3.11 | |
| Common StockMay 21, 2015 | 150 | 3.1099 | |
| Common StockMay 21, 2015 | 600 | 3.10 | |
| Common StockMay 21, 2015 | 1000 | 2.35 | |
| Common StockMay 21, 2015 | 4000 | 2.3451 | |

**Certification for JM Zulueta (cont.)**

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common StockMay 21, 2015 | 5600 | 2.121 | |
| Common StockMay 21, 2015 | 9400 | 2.12 | |
| Common StockMay 21, 2015 | 5000 | 2.36 | |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 05/24/2015



# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against IsoRay, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The IsoRay, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Tim
**Middle initial:**
**Last name:** Yuen
**Address:** REDACTED [redacted]
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 5/21/2015 | 2000 | 3.10 |
| Common Stock5/21/2015 | 4000 | 3.69 | |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common StockSell Date | # of Shares | Price per Share | |

**Certification for Tim Yuen (cont.)**

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 05/21/2015